to his wife a house and lot. The petitioner resided upon the property with his mother, the owner and occupant, and for nine years paid the taxes, as above stated. The court held that the petitioner paid the taxes as a mere volunteer, and had no interest to protect and no obligation to discharge; that the assessments were void on their face, and that no effort was made to collect them; that the section "does not apply to taxes voluntarily paid, but to those collected under the compulsion of law, as was the case in Adams v. Board, where the land assessed had been sold for nonpayment of the taxes there involved"; and that neither the statute nor the authority invoked by the appellant had any application to the case. In the present proceeding the stipulation expressly states that the several taxes "were voluntarily paid by the petitioner," and the Case of McCue is conclusive upon us and against the right of the petitioner to maintain this proceeding.

There remains, however, a question whether the school taxes are within the provisions of section 16, above quoted. The respondent contends that the statute applies to all taxes, including school taxes, while the appellant contends that such taxes never come before the board of supervisors "for its action, confirmation, or review." The consolidated school law (chapter 556, Laws 1894), which, in matters essential to this question, does not differ from the act in force when the school taxes of 1893 were levied and paid, provides for the assessment of the school tax by the school trustees, and the collection of the same by their collector; and the stipulation states that they were so levied and collected. We find no provision of law by which, and no allegation in the petition that, the school taxes in question ever came before the board of supervisors for their "action, confirmation, or review." On the contrary, it appears that all action in regard to them, both as to levy and collection, was taken by the school board and its collector. Consequently we must hold that there was no authority in the county court to make an order for the refunding of the school taxes sought for in this proceeding. The order should be reversed.

Order reversed, with $10 costs and disbursements. All concur.

---

### WESTCHESTER ELECTRIC R. CO. v. ANGEVINE.

(Supreme Court, Appellate Division, Second Department. June 22, 1900.)

1. KILLING GLANDERED HORSES—AUTHORITY OF OFFICER.

A resolution by a city board of health that the health officer request the Society for the Prevention of Cruelty to Animals to send their veterinary surgeon and investigate all stables, and that the health officer be authorized to condemn and destroy such horses as may be found glandered, is no justification to an officer of the Society for the Prevention of Cruelty to Animals for killing glandered horses found by him before same have been reported to the board of health, and the report acted upon by it.

2. SAME—DAMAGES—INSTRUCTIONS AS TO VALUE.

Since, under the public health law (Laws 1894, c. 674, §§ 62, 63), the state pays the owner the appraised value of a glandered horse put to

death pursuant to the rules and regulations of the board of health, it is not error to instruct the jury, in an action against an officer of the Humane Society for the value of horses killed by him, that, even if the horses had the glanders, they might, in estimating the value, take into consideration the fact that the state, on condemnation through the local board of health, would pay an amount not exceeding $50 for each horse.

Appeal from trial term, Westchester county.

Action by the Westchester Electric Railroad Company against Gilbert J. Angevine for damages for the killing of certain horses. From a judgment for plaintiff, defendant appeals. Affirmed.

Argued before GOODRICH, P. J., and BARTLETT, WOODWARD, and JENKS, JJ.

David Swits, for appellant.
John R. Halsey, for respondent.

GOODRICH, P. J. The plaintiff brings this action to recover damages sustained by it through the killing of three of its horses by the defendant in June, 1896. The killing of the horses was admitted by the defendant, who alleged that they were affected with "glanders," and that under and pursuant to the authority conferred upon him by the board of health of the city of Mt. Vernon, which board was duly constituted under the laws of the state, and had jurisdiction of the matter, he duly destroyed said horses; that said board had duly declared that the horses were affected with glanders, and that the premises where they were confined was dangerous to the public health of said city; and that the defendant is "a duly-qualified officer of the Society for the Prevention of Cruelty to Animals, and clothed with power by law to destroy suffering, sick, and incapacitated animals." The plaintiff proved its ownership of the horses, the killing by the defendant, gave evidence of the value of the horses, and rested. The defendant offered testimony that the horses were afflicted with glanders, and were of little value. He also offered in evidence a resolution of the board of health directing Mr. Weimar "to procure the services of a veterinary surgeon to consult with Dr. Marsh on the case reported and report; if found, on investigation, to be glanders, that health officers be authorized to have horses killed." There was another resolution "that the health officer communicate with the Society for the Prevention of Cruelty to Animals, and request them to send their veterinary surgeon, and investigate all stables such as the health officer designates; and that the health officer be authorized to condemn and destroy such horses as may be found glandered." At the close of the plaintiff's evidence the defendant moved to dismiss the complaint on the ground that the evidence of plaintiff failed to connect the defendant with the unlawful killing of these horses. The motion was denied, and defendant excepted. At the close of defendant's evidence, counsel moved for the direction of a verdict "upon the ground that it affirmatively appears that he was directed by the local board of health of the city of Mt. Vernon to destroy the horses in question as being dangerous to health, and a nuisance, under the statutory power conferred on said board." The motion was denied, and defendant excepted. The jury rendered a verdict for $150, the value of the

horses, and from the judgment entered thereon and the order denying the motion for a new trial the defendant appeals.

The court directed the jury to find a verdict for the plaintiff on the ground that the authority conferred upon the defendant by the board of health of Mt. Vernon was no legal justification. The defendant excepted to this portion of the charge. The resolution of the board of health did not confer authority upon the defendant to kill the horses. The most that can be said of the resolution is that the surgeons were instructed to report, and, until the report was made and acted upon by the board of health, the defendant had no authority to kill the horses. The board had no power to delegate the exercise of its judgment to any subordinate or to any officer of the Society for the Prevention of Cruelty to Animals. There is abundant authority for the principle that the public powers of trusts devolved by law or charter upon the council or governing body, to be exercised by it only, and in such manner as it shall judge best, cannot be delegated to others. Dill. Mun. Corp. § 96 (60); In re Emigrant Industrial Sav. Bank, 75 N. Y. 393; Gregory v. Mayor, etc., 40 N. Y. 273. In Health Department of City of New York v. Rector, etc., of Trinity Church, 145 N. Y. 33, 48, 39 N. E. 833, it was held that "no decision of a board of health, even if made on a hearing, can conclude the owner upon the question of nuisance." People v. Board of Health of City of Yonkers, 140 N. Y. 1, 10, 35 N. E. 320, 23 L. R. A. 481, held that "whoever abates an alleged nuisance, and thus destroys or injures private property, or interferes with private rights, whether he be a public officer or private person, unless he acts under the judgment or order of a court having jurisdiction, does so at his peril; and when his act is challenged in the regular judicial tribunals it must appear that the thing abated was in fact a nuisance." The court instructed the jury that they must find a verdict for the plaintiff, inasmuch as the authority alleged to have been conferred upon the defendant by the board of health of Mt. Vernon afforded him no legal justification for killing the horses. It was only in regard to the measure of damages that the court left any question to the jury in reference to the diseased condition of the animals. The jury were instructed that, if the horses were free from disease, they could give the actual value, not exceeding the amount claimed by the plaintiff; and that, even if the horses had glanders, the jury, in estimating their value, could take into consideration the fact that the state, on condemnation through the local board, would pay an amount not exceeding $50 for each horse. An exception was taken to both instructions. We have already shown that the court was right in holding that the plaintiff was entitled to a verdict for some amount. We think the court was equally right in that portion of the charge in which the jury were told that they could take into consideration the fact that the state would pay a certain valuation in case of condemnation. This fact was proof that even glandered horses, when lawfully put to death at the instance of state authorities, have a value for which the owner is entitled to be compensated. The public health law (chapter 674, Laws 1894), in sections 62 and 63, distinctly recognizes this fact in providing for the killing of glandered horses pursuant to rules and regulations prescribed by the state board of health,

and for the appraisal of the value of said horses, not exceeding $50 each. The charge was correct.

We have examined the other exceptions and find none tenable. The judgment should therefore be affirmed.

Judgment and order affirmed, with costs. All concur.